# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### AIKEN DIVISION

| | | |
|---|---|---|
| John Wesley Hightower, | ) | Civil Action No. 1:13-cv-03558-JMC |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| Savannah River Remediation, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Plaintiff John Wesley Hightower ("Hightower") filed this action against his employer, Defendant Savannah River Remediation, LLC ("SRR"), alleging that he was subjected to (1) discrimination because of his race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17; (2) retaliation for engaging in activity protected by Title VII; (3) interference with rights protected by the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601–2654; and (4) retaliation for engaging in activity protected by the FMLA. (ECF No. 1.)

This matter is before the court on SRR's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56. (ECF No. 40.) In accordance with 28 U.S.C. § 636(b) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.), the matter was referred to United States Magistrate Judge Paige J. Gossett for pretrial handling. On November 24, 2015, the Magistrate Judge issued a Report and Recommendation in which she recommended that the court grant SRR's Motion for Summary Judgment as to all of Hightower's claims. (ECF No. 65.) Hightower filed Objections to the Magistrate Judge's Report and Recommendation, which are presently before the court. (ECF No. 69.) For the reasons set forth below, the court **ACCEPTS** the Magistrate Judge's recommendation and **GRANTS** SRR's Motion for Summary Judgment.

## I.    RELEVANT BACKGROUND TO PENDING MOTION

The facts of this matter are discussed in the Report and Recommendation.  (ECF No. 65.) The court concludes, upon its own careful review of the record, that the Magistrate Judge's factual summation is accurate and incorporates it by reference.  The court will only reference herein additional facts viewed in the light most favorable to Plaintiff that are pertinent to the analysis of her claims.

SRR "is the liquid waste contractor at the Savannah River Site, which is owned by the U.S. Department of Energy."  SRR, http://www.srremediation.com (last visited Mar. 23, 2016). SRR operates 2 tank farms (Tank Farm H and Tank Farm F), a defense waste processing facility ("DWPF"), an effluent treatment facility ("ETF") and a saltstone facility.  (ECF No. 40-1 at 2.) "Each of these operations works to process and store waste generated at the Savannah River Site."  (Id.)

Hightower is a 59 year old, African-American male.  (ECF No. 40-7 at 3/9:14–15.[1]) Hightower is currently employed by SRR as a technical training advisor.  (Id. at 18/67:7– 19/70:13.)  However, during the events that form the basis for this lawsuit, Hightower was employed as the training lead for tank farm/ETP and projects and he supervised a team of 16 subordinates that included the following individuals: Jeff Becker ("Becker"), Gordan Zipter ("Zipter"), Kathy Moore ("Moore"), Carol Sanderson, Mike Walls ("Walls"), Julius Myers, Steve Kolodziejczak ("Kolodziejczak"), Martha Grant, Mike Bevington, Les Martin, Bruce Hughey, Karen Bodiford, and Chris Parker.[2]  (Id. at 10/36:9–11/39:2 & 27/104:8–105:7.) Hightower reported directly to SRR's training manager, Charles Lampley ("Lampley"), and its

---

[1] The court observes that the docket contains condensed transcripts with 4 pages of testimony on each page.  Therefore, the number before the slash is the ECF page number and the number after the slash is the transcript page number.

[2] Hightower became tank farm training lead on September 19, 2011.  (ECF No. 40-7 at 10/37:17– 22.)

manager for emergency preparedness training and procedures, Paul Shedd ("Shedd"), was Hightower's next level manager.  (Id. at 22/83:21–85:4.)

On November 5 through November 14, 2012, a Facility Evaluation Board[3] ("FEB") conducted a routine operational evaluation on various operations within SRR's facilities.  (Id. at 28/106:3–107:9.)  During the operational evaluation, an assessor became concerned with how Walls and Kolodziejczack were responding to various inquiries.  (Id. at 107:5–24 & 29/112:24–114:14.)  As a result, the operational evaluation was suspended.  (ECF Nos. 40-8 at 17/57:24–58:5 & 40-7 at 30/116:22–117:25.)

On November 14, 2012, Hightower contacted Becker to set up a meeting to discuss issues resulting from the operational evaluation.  (ECF No. 40-7 at 31/120:22–121:6.)  Becker requested that employees within the team be included in the meeting.  (Id. at 121:7–18 & 32/122:13–123:13.)  During the meeting, Hightower attempted to address the FEB's findings and recommendations.  (Id. at 28/109:5–24.)  Kolodziejczack became defensive and told Hightower that he felt as though Hightower was questioning his integrity because he was one of the instructors who performed the evaluation at issue.  (Id. at 35/134:1–135:25.)  Hightower responded that his comments were not meant to question anyone's integrity or be taken personally.  (Id. at 136:24–137:11.)  As Hightower tried to continue on with the meeting, Walls then became upset, started cussing and yelling at Hightower, stood up from his chair, and ran towards Hightower in a threatening way.  (Id. at 29/111:23–112:20.)  Becker, who was standing nearby, intercepted Walls and escorted him out of the meeting room.  (Id.)  After the meeting with his team ended, Hightower met with Lampley and told him about the incidents involving Walls and Kolodziejczack.  (Id. at 40/156:8–14.)

---

[3] The FEB consists of a group of individuals who are assigned to do assessments at various points in SRR's facility.  (ECF No. 40-7 at 28/106:12–19.)

On November 15, 2012, Hightower again spoke with Lampley about the team meeting because Hightower wanted to take disciplinary action against Walls.  (ECF No. 40-8 at 13/41:10–42:23.)  Lampley told Hightower that he would address the issue and discuss the situation more with Hightower and his team after Hightower returned to work from his medical leave.  (ECF No. 40-7 at 41/159:16–25.)  On the afternoon of November 15, 2012, Hightower began his medical leave.  (Id. at 27/102:20–23 & 41/158:4–8.)

On November 16, 2012, Becker contacted Lampley to request a meeting involving Becker, Lampley, and other subordinates of Hightower.  (ECF No. 40-8 at 18/63:16–64:14.)  At the meeting with Lampley, individuals from Hightower's team (Becker, Kolodziejczack, Sanderson, Zipter, and Moore) conveyed their dissatisfaction with working conditions and Hightower's management style.  (Id. at 19/68:18–20/70:11.)  Immediately following this meeting, Lampley contacted the director of human resources, Ted Myers ("Myers"), and told him about the issues involving Hightower and his team.  (Id. at 21/73:7–23.)  Myers informed Lampley that the issues involving Hightower and his team could not be addressed until he returned from medical leave.  (Id.)

On or about November 19, 2012, Lampley called Hightower to see how he was doing after his surgery.  (ECF No. 40-7 at 50/194:16–22 & 196:6–10.)  During this conversation, Hightower learned that members of his team had met with Lampley, but Lampley did not discuss specifics of the meeting.  (Id. at 51/198:2–5.)  After speaking with Lampley, Hightower called Lavoris Curry, the deputy human resources director, on November 20, 2012.  (Id. at 47/183:1–8 & 51/200:13.)  Hightower told Curry about the issues he was having with his team, but Curry told Hightower to not worry about the issues until he returned to work from medical leave.  (Id. at 183:11–25.)

On December 19, 2012, Lampley contacted Hightower to schedule a meeting on December 20, 2012, between Lampley, Hightower, and Myers.  (Id. at 49/191:2–192:5.) Hightower then contacted Stephanie Franklin ("Franklin"), the head of SRR's EEO department, to schedule a meeting also for the following day.  (Id. at 48/188:13–23.)

On December 20, 2012, Hightower met with Lampley and Myers.  (Id. at 51/200:14–16.) During this meeting, Lampley and Myers shared with Hightower the complaints that Lampley had received from Hightower's team.  (Id. at 200:17–201:21.)  Myers and Lampley asked Hightower to meet with his team and apologize for issues that had been caused by his management style.  (Id. at 201:16–21.)  Although he did not agree with what was being said, Hightower agreed that he would apologize to his team.  (Id. at 51/201:22–52/202:2.)

Also on December 20, 2012, Hightower spoke with Lampley about utilizing the work-hardening program as a way of re-acclimating himself to a full day's work.  (ECF No. 40-7 at 108.)  Work hardening was a policy offered by SRR that would permit Hightower to work a half a day and then use short term disability time to take the afternoon off.  (ECF No. 40-7 at 54/213:11–55/214:12 & 70/277:7–25.)  During their meeting, Lampley approved Hightower to use work-hardening to combine vacation days and short term disability, but Lampley retracted his prior approval the following day.  (Id.)  Lampley sent Hightower an e-mail explaining that he would not be able to use short term disability time through the work hardening program as was originally planned and approved.  (ECF No. 40-7 at 108.)

Lampley and Shedd met with Hightower's group on January 2, 2013, and explained to them that Hightower would be returning as the training lead and that he and the group would work through their issues.  (ECF No. 40-11 at 26/97:11–98:14.)  On January 3, 2013, Lampley sent Hightower an email to remind him that the "key to your successful re-entry as the TF

Training Lead was going to be you addressing your team with an open apology and a commitment to improve your relationship with them."  (ECF No. 40-7 at 110.)  Lampley further explained that he, Myers, and Shedd had come up with "thoughts on what your approach should be," "talking points" to consider, and a draft script.  (Id.)  On January 4, 2013, Lampley was informed by Hightower that he refused to accept blame for the November 14, 2012 meeting and, therefore, would not be apologizing for that meeting.  (Id. at 52/204:7–205:12.)

On January 7, 2013, Hightower returned to work.  (Id. at 57/19–24.)  Later that day, Franklin contacted Lampley and Shedd and informed them that Hightower had filed a complaint with SRR's EEO and that no action was to be made with Hightower's team during the EEO investigation.  (ECF Nos. 40-7 at 60/237:25–61/238:9 & 40-11 at 36/138:6–18.)  On January 8, 2013, Hightower met with Franklin to discuss the complaint that he had made with SRR's EEO office.  (Id. at 239:22–240:1-22.)  During their meeting, Hightower learned that Franklin had met with Walls, Becker and other members of Hightower's team and that they had expressed some concerns to Franklin about Hightower's management style.  (Id. at 240:3–22.)

On January 14, 2014, Hightower met with Myers, Lampley and Shedd, who presented Hightower with a Performance Improvement Plan ("PIP").  (Id. at 63/249:11–64/250:13 & 113.) The PIP informed Hightower that it was the result "of a culmination of events and behaviors that are affecting your relationships with your co-workers . . ." because "the work group that you lead as well as some of your customers expressed concerns on your interpersonal skills and your relationships . . ." and "a formal EEO investigation resulted in the same conclusion and confirmed that you have displayed a pattern of unacceptable behaviors in leading your work group."  (ECF No. 40-7 at 113.)  The PIP set forth the following objectives for Hightower to meet:

1.  Behave in a professional manner at all times with your peers, clients and customers.  This means being respectful of others opinions.

2.  Submit to a behavioral and leadership assessment by Dr. Luther Johnson, President, Luther Johnson and Associates.  Input to the assessment will include a SYMLOG personality profile.  The assessment is designed to identify and confirm your gaps in leadership and management skills, and develop a plan and schedule for correction and improvement that facilitates immediate and lasting change in behavior that elicits trust, credibility and respect from employees, peers, and senior management.  The results of the action plan will be reviewed by your management, forming the basis of accountability for improvement and a quarterly assessment of progress.

3.  Complete a 360 Degree Feedback Instrument at the beginning and end of this one year period.

4.  Read one leadership book (e.g. Crucial Conversations, 360 Degree Leadership, The 21 Irrefutable Laws of Leadership et.al.) a quarter to further develop your leadership skills.

(Id.)  The PIP further explained that the "failure to comply with these objectives will result in you being removed from a lead position and assigned to a position as an individual contributor."

(Id.)  Hightower was instructed to review the PIP, sign it, and return it the next day.  (Id. at 64/250:17–24.)

On January 15, 2013, Lampley met with Hightower who communicated that he had some concerns about the PIP because he did not have a performance problem.  (Id. at 252:14–253:10.) On January 16, 2013, Lampley presented Hightower with a Development Plan.  (ECF No. 40-7 at 64/253:11–22 & 114.) The Development Plan contained the same content as the PIP except that the Development Plan stated a different finding from the EEO investigation and the first objective was different.  (Compare ECF No. 40-7 at 113 to 114.)  Hightower disagreed with the Development Plan on the basis that he was not aware that anything was wrong with his management style.  (Id. at 65/254:4–12.)  Rather than "acknowledge and agree to the terms" of the Development Plan, Hightower chose to write a comment on the bottom of the document stating that "I acknowledge the receipt of this document and do not agree with all of its content."

(Id. at 114.)

On or about January 16, 2013, Hightower met with Shedd who told Hightower that the way he signed the Development Plan was unacceptable to management. (ECF No. 40-11 at 39/149:10–20.) Shedd tried to encourage Hightower to sign and accept the terms of the Development Plan so that he could get back to work as a training lead with his group. (Id.) Shedd tried to convince Hightower that the Development Plan was not punitive and was an attempt to heal the relationship between Hightower and his team. (Id. at 149:22–150:25.) However, Hightower refused to sign and accept the terms of the Development Plan. (ECF No. 40-7 at 66/258:4–10.) SRR's senior management (Myers and Patricia Allen, SRR's director of environmental, safety, health & QA, & CA) decided that Hightower's actions were unacceptable. (ECF No. 40-8 at 34/127:15– 128:16.) As a result, Hightower was reassigned to a training advisor role in SRR's media and support group effective January 22, 2013. (ECF No. 40-7 at 25/94:14–16 & 115.)

On or about May 17, 2013, Hightower filed a Charge of Discrimination (the "Charge") with the United States Equal Employment Opportunity Commission ("EEOC") and the South Carolina Human Affairs Commission ("SCHAC"). (ECF No. 40-7 at 103.) In the Charge, Hightower alleged that he was discriminated against because of his race in violation of Title VII and because of his disability in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101–12213. (Id.) In the Charge, Hightower stated the following particulars:

> I currently work for the above cited employer since January 1985. My job title is Tank Farm/ETP Training Lead. After I filed an internal EEO complaint[,] management isolated me from my employees and I was told not to have contact with them nor was I allowed to go into the areas in which they worked which did not allow me to fully do my job. I was threatened with termination if I did not provide Stephanie Franklin a[] particular individual[']s name for investigative

purposes. I was being questioned while under the influence of prescribed medication and while on medical leave.

[On] January 16, 2013[,] I was removed from my position and placed in a job with less responsibility. I was the only black lead on the team and I have been replaced by a white male. To my knowledge, the white male was not asked to do written job justification and he was granted an increase for working in my previous position as DWPF Training Leads.

(Id.)

After receiving notice of the right to sue from the EEOC as to the Charge, Hightower filed an action in this court on November 20, 2013, alleging claims for (1) Title VII race discrimination (Count 1), Title VII retaliation (Count 2), and violation of the FMLA (Count 3). (ECF No. 1 at 6–8.) SRR answered the Complaint on January 23, 2014, denying its allegations. (ECF No. 5.) On March 9, 2015, SRR moved for summary judgment. (ECF No. 40.) Hightower filed a Memorandum in Opposition to Defendant's Motion for Summary Judgment on May 8, 2015, to which SRR filed a Reply to Plaintiff's Memorandum in Opposition on June 8, 2015. (ECF Nos. 52, 60.)

The Magistrate Judge issued her Report and Recommendation on November 24, 2015, recommending that SRR's Motion for Summary Judgment be granted as to all Hightower's claims. (ECF No. 65.) On December 14, 2015, Hightower filed Objections to the Report and Recommendation. (ECF No. 69.) SRR responded to Hightower's Objections on January 8, 2016. (ECF No. 74.)

Thereafter, on February 24, 2016, the court heard argument from the parties on the pending Motion for Summary Judgment. (ECF No. 78.)

## II.     JURISDICTION

This court has jurisdiction over Hightower's Title VII claims via 28 U.S.C. § 1331, as the claims arise under a law of the United States, and also via 42 U.S.C. § 2000e–5(f)(3), which

empowers district courts to hear claims "brought under" Title VII.  Additionally, the court has jurisdiction over Hightower's FMLA claims pursuant to 29 U.S.C. § 2617(a)(2), which provides that an action under the FMLA may be maintained "against any employer (including a public agency) in any Federal or State court of competent jurisdiction . . . ."  Id.

## III.     LEGAL STANDARD

A.     The Magistrate Judge's Report and Recommendation

The Magistrate Judge makes only a recommendation to this court.  The recommendation has no presumptive weight.  The responsibility to make a final determination remains with this court.  See Mathews v. Weber, 423 U.S. 261, 270–71 (1976).  The court reviews de novo only those portions of a magistrate judge's report and recommendation to which specific objections are filed, and reviews those portions which are not objected to - including those portions to which only "general and conclusory" objections have been made - for clear error.  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983); Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982).  The court may accept, reject, or modify, in whole or in part, the recommendation of the magistrate judge or recommit the matter with instructions.  See 28 U.S.C. § 636(b)(1).

B.     Summary Judgment Generally

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248–49 (1986).  A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party.

Newport News Holdings Corp. v. Virtual City Vision, 650 F.3d 423, 434 (4th Cir. 2011).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990).  The non-moving party may not oppose a motion for summary judgment with mere allegations or denial of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial.  Fed. R. Civ. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).  All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  Anderson, 477 U.S. at 249.  "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion."  Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

## IV.     ANALYSIS

A.     The Report and Recommendation

In the Report and Recommendation, the Magistrate Judge observed that Hightower's reliance on a "mosaic theory" of direct proof did not allow him to "forecast direct proof of race discrimination."  (ECF No. 65 at 8.)  The Magistrate Judge further observed that Hightower did not successfully utilize the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to show race discrimination because he failed to demonstrate that he was performing at a level that met SRR's legitimate expectations.  (ECF No. 65 at 8–10.)  In this regard, the Magistrate Judge determined that the evidence regarding Hightower's failure to meet SRR's proffered expectations was enough to foreclose Hightower from either establishing a prima facie case of race discrimination and or demonstrating that SRR's proffered reason for his

reassignment was a pretext for discrimination.  (Id.)  For the same reason, the Magistrate Judge recommended granting summary judgment to SRR on Hightower's Title VII retaliation claim on the basis that his evidence did not show SRR's legitimate, non-discriminatory reason was pretextual.  (Id. at 12.)

As to Hightower's FMLA claims, the Magistrate Judge agreed with SRR that the FMLA claims fail because "the record does not support any allegation that Hightower availed himself of or sought leave pursuant to the FMLA; rather, the record unequivocally demonstrates that Hightower availed himself of the short-term disability program pursuant to company policy." (Id. at 14.)  However, even assuming Hightower's medical leave was taken pursuant to the FMLA, the Magistrate Judge recommended summary judgment for SRR on the FMLA claims because (1) Hightower could not show he was denied any benefit or rights under the FMLA and (2) SRR offered legitimate, non-retaliatory reasons for its actions and Hightower failed to demonstrate by a preponderance of the evidence that the proffered reasons were not its true reason, but were a pretext for retaliation.  (Id. at 14–16.)

Based on the foregoing, the Magistrate Judge recommended granting SRR's Motion for Summary Judgment in its entirety.  (Id. at 16.)

B.     Hightower's Objections

Hightower first objects to the Magistrate Judge's finding that he cannot demonstrate either the satisfactory performance element of a prima facie case of race discrimination or pretext.  (ECF No. 69 at 4.)  He argues that the Magistrate Judge considered the evidence presented by SRR "to support their assertion that legitimate expectations were not met without giving proper consideration to the evidence presented by the Plaintiff that rebuts the same; nor does the Magistrate [Judge] consider the Plaintiff's evidence and reasonable inferences drawn

therefrom in the light most favorable to the Plaintiff."  (Id. at 4–5.)  Hightower further specifies that the PIP and Development Plan both occurred after his EEO complaint and his demotion occurred notwithstanding a positive prior performance review.  (Id. at 5–7.)  Based on the foregoing, Hightower asserts that "[t]here is ample evidence for a jury to reasonably conclude that . . . [SRR's] expectations were not legitimately held and the proffered reasons are pretext."  (Id. at 8.)  For the same reasons, Hightower also argues that he has established pretext to overcome the Magistrate Judge's recommendation that Hightower's Title VII retaliation claim should be dismissed.  (Id. at 9–12.)

As to his FMLA retaliation claim, Hightower argues that the Magistrate Judge erroneously found pretext lacking when "[t]he evidence sufficiently shows pretext through a close temporal proximity between the protected activity and adverse actions . . . ."  (Id. at 13.) As to his FMLA interference claim, Hightower argues that the Magistrate Judge erred in concluding that 29 C.F.R. § 825.700 does not support a claim under the FMLA for denial of the work hardening program because "this provision was enacted so that an employer would have to adhere to their own written plans and not discriminate simply because the person was on FMLA."  (Id. at 14.)

C.    The Court's Review

In light of the foregoing authorities and the parties' respective positions, the court considers each of the claims relevant to SRR's Motion for Summary Judgment in turn below.

1.  *Race Discrimination*

In his Objections, Hightower asserts that he was performing his job satisfactorily at the time of his demotion and argues that his evidence demonstrates that SRR's reasons for demoting him were pretextual.  (ECF No. 69 at 7–9.)

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . . ." 42 U.S.C. § 2000e-2(a)(1). "Absent direct evidence, the elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Coleman v. Md. Ct. App., 626 F.3d 187, 190 (4th Cir. 2010). "The employer may then rebut the prima facie case by showing that there was a legitimate non-discriminatory reason for the adverse action, after which the burden shifts back to the plaintiff to show that those reasons are pretextual." Hammett v. S.C. Dep't of Health & Envtl. Control, C/A No. 3:10-932-MBS-SVH, 2013 WL 1316440, at *5 (D.S.C. Jan. 25, 2013) (citing Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005)).

Even assuming without deciding Hightower can establish a prima facie case of race discrimination regarding his demotion to the training lead positon, in order for Hightower to survive SRR's Motion for Summary Judgment, he has to come forward with sufficient evidence to demonstrate that the legitimate reason offered by SRR was not its true reason, but was a pretext for discrimination. Specifically, SRR has stated that Hightower was demoted because "he refused to sign and comply with the terms of his Development Plan." (ECF No. 40-1 at 25 (citing ECF Nos. 40-8 at 34/127:15–128:9 & 40-11 at 39/151:4–152:6.)

In his response to SRR's proffered reason for his demotion, Hightower asserts the following:

The Plaintiff should never have been subjected to the plan in the first place, as his performance as an employee and manager was positive. It was not until after Walls gross insubordination on November 14, 2012 that there were suddenly complaints about Plaintiff's leadership style. Plaintiff's performance evaluation in the consolidated position was very positive. (Shedd Dep., Ex. 2). Hightower's past and current subordinates agreed that he is a good manager and team leader. Shedd felt Plaintiff "always performed well"; and that because of the consolidation and increased scope of responsibilities, some of the employees may have attributed the stress of the increase to Plaintiff. (Shedd Dep. 91-93). Becker, Walls and Kolo never wanted Plaintiff to come in the first place; and Walls and Kolo even went so far as to call DWPF before Plaintiff actually transferred and even after and told them to not send that "son of a bitch" over. (Bodiford Dep. 16-17, Brant Dep, 14-21; Becker Dep. 66-68). Becker even told Plaintiff that he had no credibility after Dancing with the Aiken Stars—where he danced with a white woman and was in the paper. (Plaintiff Dep. 202-203).

This evidence is probative to pretext and indicates that the proffered reason is false. It is difficult to believe that Shed[d] or the others would believe that Plaintiff suddenly had management issues where his records was [sic] previously good; and they knew or should have known if an actual investigation was truly conducted that Becker, Walls and Kolo had issues with Plaintiff even before he was there [sic] manager. However, Becker was actually awarded the Plaintiff's position instead and Walls received a reprimand only after the complaint of discrimination.

Pretext is further supported by the shifting reasons for the actions of the defendant. The courts have held that shifting reasons for adverse action is probative of pretext. E.E.O.C. v Sears Roebuck & Co., 243 F.3d 846 (4th Cir. 2001). Here, the Defendant has tried to call the PIP and Development Plans non-corrective; yet they then use it as a basis to demote the Plaintiff. The Defendant told Plaintiff he did not have a performance problem, then issued a performance improvement plan claiming a pattern of unacceptable behavior (of which there is no record of such pattern), and then changed the document to a Development Plan instead. (Pl. Dep., Ex. 8, Ex. 9, Ex. 10). These vacillating reasons strongly infer pretext.

(ECF No. 52 at 27.)

"The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." Anderson v. Ziehm Imaging, Inc., C/A No. 7:09-02574-JMC, 2011 WL 1374794, at *5 (D.S.C. Apr. 12, 2011) (citing Stewart v. Henderson, 207 F.3d 374, 376 (7th Cir. 2000)). "The ultimate question is whether the employer intentionally discriminated and proof that the employer's proffered reason is unpersuasive, or even obviously

contrived, does not necessarily establish that [plaintiff's] proffered reason . . . is correct . . . [i]t is not enough to disbelieve the [employer]." Love-Lane v. Martin, 355 F.3d 766, 788 (4th Cir. 2004) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-47 (2000)) (internal citations omitted). Rather, Hightower must demonstrate that a reasonable jury could "believe [his] explanation of intentional race discrimination." Id.

Upon the court's review, there is insufficient evidence to support a finding that SRR's decision to demote Hightower to the training advisor position effective January 22, 2013, was motivated by his race. Jiminez v. Mary Washington Coll., 57 F.3d 369, 378 (4th Cir. 1995) ("[T]o establish that a proffered reason for the challenged action   was pretext for discrimination, the plaintiff must prove 'both that the reason was false, and that discrimination was the real reason' for the challenged conduct.") (citation omitted). The court finds that Hightower's evidence as highlighted in his Objections to the Magistrate Judge's Report and Recommendation and his Memorandum in Opposition to Defendant's Motion for Summary Judgment does not rise to the level necessary to establish that his race actually played a role in the decision-making process and had a determinative influence on the outcome. In employment discrimination actions, it is not the role of the court to "sit as a super-personnel department weighing the prudence of employment decisions." Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005) (internal quotation marks omitted). Based on the foregoing, the Magistrate Judge correctly found that Hightower has not produced sufficient evidence to meet his burden of proving that SRR's asserted reasons for demoting him effective January 22, 2013, were a pretext for race discrimination. Accordingly, Hightower's Title VII race discrimination claims fail as a matter of law and SRR is entitled to summary judgment.

### 2. *Retaliation in Violation of Title VII*

Hightower asserts that he suffered adverse employment actions of demotion and loss of approved benefits in retaliation for contacting in-house EEO on December 19, 2012, and filing a complaint on or about December 20, 2012. (ECF No. 40-7 at 104–07.) In this regard, Hightower objects to the Magistrate Judge's determination that SRR has offered legitimate, non-retaliatory reasons for demoting Hightower and denying him work hardening[4] to force him to use vacation time (reversing his previously granted excess carryover). (ECF No. 65 at 12.) Hightower argues that he has established pretext and summary judgment should be denied. (ECF No. 69 at 9.)

Title VII protects individuals from retaliation. 42 U.S.C. § 2000e-3(a).[5] In order to prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under the aforementioned burden-shifting method. Under the burden-shifting method, to demonstrate a prima facie case of retaliation under Title VII, a plaintiff must show (1) that he engaged in protected activity; (2) that his employer took an adverse employment action against him; and (3) that a causal connection existed between the protected activity and the asserted adverse action. Rhoads v. F.D.I.C., 257 F.3d 373, 392 (4th Cir. 2001); Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 242 (4th Cir. 1997). Once the plaintiff establishes a prima facie case of retaliation, the defendant can rebut the presumption

---

[4] Work hardening was SRR's policy that would have allowed Hightower "to work a half a day and then use short term disability time to take the afternoon off." (ECF No. 52 at 10.) Hightower was initially approved to use the work hardening program to combine excess vacation time with short-term disability. (ECF No. 40-7 at 54/213:24–55/214:12.) SRR retracted the approval because the combination was not permissible under its policy. (Id. at 108.)

[5] "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

of retaliation by articulating a non-discriminatory reason for its action.  <u>Matvia v. Bald Head Island Mgmt., Inc.</u>, 259 F.3d 261, 271 (4th Cir. 2001) (citation omitted).  At that point, the plaintiff has the opportunity to prove that the employer's legitimate, non-discriminatory reason is pretextual.  <u>Id.</u>

Upon review, the court agrees with the Magistrate Judge that Hightower's Title VII retaliation claim fails for the same reason his Title VII race discrimination claim failed: the absence of sufficient evidence indicating that SRR's stated non-retaliatory reason for the adverse employment actions that Hightower suffered were pretextual.  Therefore, the court overrules Hightower's Objection and finds that SRR is entitled to summary judgment on his Title VII retaliation claim.

### 3.  Interference with FMLA Rights

On November 16, 2012, Hightower was hospitalized and underwent surgery to remove a disc from his back.  (ECF No. 40-7 at 6/19:20–20:1.)  He was out on leave from November 15, 2012, until December 20, 2012.  (<u>Id.</u> at 26/101:6–10.)  Hightower asserts an FMLA interference claim based on his allegations that when he returned to work, SRR denied him the benefit of work hardening and forced him to use annual leave time instead even though SRR had already approved the excess carryover for the annual leave and medical approved work hardening. Hightower asserts that under the FMLA and 29 C.F.R. § 825.700, SRR violated Hightower's rights by denying him "the benefit of work hardening under the work hardening program nor force him to use annual leave where he should have been allowed to work part of the day and use short term disability leave the other part of the day while he acclimented [sic] back to work." (ECF No. 52 at 36.)

The FMLA entitles qualifying employees to up to twelve (12) weeks of unpaid leave each

year if, among other things, an employee has a "serious health condition[6] that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  Qualifying employees who return to work within that 12-week period are entitled to be reinstated to their previous position, or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).

Under the FMLA, a plaintiff may bring a claim for interference in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act. Gleaton v. Monumental Life Ins. Co., 719 F. Supp. 2d 623, 633 n.3 (D.S.C. 2010) (citation omitted).  To establish a case of FMLA interference, plaintiff must show that: (1) he was an eligible employee; (2) his employer was covered by the FMLA; (3) he was entitled to FMLA leave; (4) he gave his employer adequate notice of his intention to take leave; and (5) his employer denied him the benefits to which he was entitled.  Rodriguez v. Smithfield Packing Co., 545 F. Supp. 2d 508, 516 (D. Md. 2008) (citing Edgar v. JAC Prods., Inc., 443 F.3d 501, 507 (6th Cir. 2006)).  "The crux of an interference claim is that the employee was discouraged from taking leave by being presented with negative consequences."  Alexander v. Carolina Fire Control Inc., No. 1:14-cv-0074, 2015 WL 4510297, at *3 (M.D.N.C. July 24, 2015) (citation omitted).

Upon review, the court observes that the crux of Hightower's Objection is that SRR's failure to observe its own policy is a violation of the FMLA.  However, "[c]ourts have interpreted 29 C.F.R. § 825.700 as not creating a federal cause of action under the FMLA to enforce voluntary employer policies which provide benefits exceeding those required by the

---

[6] A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611 (11).

FMLA." <u>Lusk v. Va. Panel Corp.</u>, C/A No. 5:13cv079, 2014 WL 1340767, at *1 (W.D. Va. Apr. 4, 2014) (citing <u>Rich v. Delta Airlines, Inc.</u>, 921 F. Supp. 767, 773 (N.D. Ga. 1996)); <u>see also</u> <u>Holmes v. e.spire Commc'ns, Inc.</u>, 135 F. Supp. 2d 657, 667 (D. Md. 2001) ("These provisions [29 C.F.R. § 825.700] cannot be interpreted to give employees a cause of action under the FMLA to enforce other employment agreements."). In <u>Rich</u>, the court provided the following explanation effectively conveying why Hightower's argument fails:

> To support her theory, the plaintiff refers this court to 29 C.F.R. § 825.700. This section addresses the interaction of an employer's internal policies and practices with the employee's rights under the FMLA. The section provides in relevant part, "An employer must observe any employment benefit program or plan that provides greater family or medical leave rights to employees than the rights established by the FMLA." 29 C.F.R. § 825.700(a). The plaintiff apparently construes this section to mean that when an employer has an employee benefit program or plan that is more generous than the benefits provided by the FMLA, then the employee automatically has a cause of action, under the FMLA, to enforce the terms of the program or plan if the employer deviates from such a program. Section 825.700 does not, and could not, however, create a federal cause of action under the FMLA to enforce the voluntary employer policies of providing benefits that exceed those required by the FMLA. The Department of Labor has no regulatory power to rewrite, and clearly did not rewrite, the FMLA in such a manner.
>
> The purpose of this regulation is to ensure that the FMLA is not interpreted to abrogate any currently existing employee-benefit plan. Therefore, if an employer has a plan or program more generous than the FMLA, then the FMLA will not supersede or reduce those more generous benefits which the employer has chosen to provide. In essence, the regulation is merely a truism which emphasizes that employers are legally bound by valid contractual agreements made with their employees regarding employment benefits. An employer's contractual obligations are distinct, however, from the regulation at issue and the FMLA itself.
>
> Because the FMLA itself neither expressly or impliedly gives the Department of Labor the authority to create a federal cause of action based upon a voluntary employee program, any regulations promulgated by the Department creating such a cause of action would be invalid.

<u>Rich</u>, 921 F. Supp. at 773.

Finding <u>Rich</u> persuasive, this court overrules Hightower's Objection to the Magistrate

Judge's recommendation to grant SRR summary judgment on the claim for FMLA interference.[7]

    *4. Retaliation for Engaging in FMLA Protect Activity*

    Under the FMLA, a plaintiff may also bring a retaliation claim, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act." Gleaton, 719 F. Supp. 2d at 633 n.3.  A retaliation claim under the FMLA is analyzed under the burden-shifting analysis that applies to a Title VII retaliation claim.  Laing v. Fed. Express Corp., 703 F.3d 713, 718–719 (4th Cir. 2013); Dodgens v. Kent Mfg. Co., 955 F. Supp. 560, 565–566 (D.S.C. 1997).  Pursuant to this framework, the employee bears the burden of establishing a prima facie case, showing (1) he engaged in protected activity; (2) the employer took adverse employment action against him; and (3) a causal connection existed between the protected activity and the adverse action.  Mercer v. Arc of Prince Georges Cnty., Inc., 532 F. App'x 392, 398 (4th Cir. 2013).  Once a prima facie case has been presented, the employer has the burden of producing a nondiscriminatory reason for its actions.  Id.  If the employer can produce a nondiscriminatory reason for its actions, the employee must demonstrate that the proffered reason is pretext for FMLA retaliation.  Id. (citing Nichols v. Ashland Hosp. Corp., 251 F.3d 496, 502 (4th Cir. 2001)).

    Upon review, the court finds that Hightower's prima facie case of FMLA retaliation fails because he cannot demonstrate that he engaged in protected activity.  Hightower's alleged violation of the FMLA was based on his belief that the FMLA protected him from SRR's failure to adhere to its own work hardening policy.  Having determined Hightower's position to be

---

[7] Even if the crux of Hightower's interference claim was unrelated to a policy of SRR, the court observes that Hightower has not submitted sufficient evidence to support a finding that he provided adequate notice to SRR and it failed to engage in the inquiry to determine whether Hightower was seeking leave under the FMLA.  29 C.F.R. § 825.303(b) ("An employee shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request.")  At this stage of his case, Hightower must provide more than merely his own bare claim that he exercised his rights under the FMLA.  He must prove it.

erroneous, his claim fails because his request for non-FMLA qualifying leave cannot sustain a FMLA retaliation claim.  E.g., Pagel v. TIN Inc., 695 F.3d 622, 631 (7th Cir. 2012) ("To succeed . . . [on a retaliation claim, the plaintiff] must of course be entitled to FMLA benefits . . . ."); Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009) ("In that case, we said that the first requirement of a retaliation claim is that '[an employee] took an FMLA leave,' . . . .") (citation omitted); Davis v. Mich. Bell Tel. Co., 543 F.3d 345, 354 (6th Cir. 2008) (plaintiff's retaliation claim fails as a matter of law because she was ineligible for FMLA leave); Walker v. Elmore Cnty. Bd. of Educ., 379 F.3d 1249, 1253 (11th Cir. 2004) (holding that retaliation claim fails because plaintiff's "request for leave was not protected by the FMLA"); cf. Sherif v. Univ. of Md. Med. Ctr., Civil No. WDQ-14-2679, 2015 WL 5083469, at *9 (D. Md. Aug. 26, 2015) ("The Fourth Circuit has not addressed whether a request for non-FMLA qualifying leave can sustain a retaliation claim.").  Accordingly, the court overrules Hightower's Objection to the Magistrate Judge's recommendation to grant SRR summary judgment on the claim for FMLA retaliation.

## V.    CONCLUSION

Upon careful consideration of the entire record, the court hereby **GRANTS** the Motion for Summary Judgment of Defendant Savannah River Remediation, LLC.  (ECF No. 40.)  The court **ACCEPTS** the Magistrate Judge's Report and Recommendation and incorporates it herein by reference.

**IT IS SO ORDERED.**

J. Michelle Childs

United States District Judge

March 23, 2016
Columbia, South Carolina

22